UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | 2:16-CV-00272-CRW |
| | ) | |
| vs. | ) | |
| | ) | |
| WASHINGTON COUNTY | ) | |
| DEPARTMENT OF EDUCATION, and | ) | |
| WASHINGTON COUNTY BOARD OF | ) | |
| EDUCATION, | ) | |
| | | |
| Defendants. | | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the

Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings,

including entry of judgment [Doc. 13].

This matter came before the Court for a bench trial on December 4-5, 2019 and January

9-10, 2020.

## I.     BACKGROUND

The Complaint at issue was filed after Plaintiff John Doe and several other students were

disciplined by the Washington County Department of Education ("school board") following a

reported hazing incident at a Fellowship of Christian Athletes Football Camp which Plaintiff

attended with the David Crockett High School ("DCHS") football team on or about July 14-16,

2015 at Tennessee Technical University in Cookeville, Tennessee. Shortly after the team returned

from the camp, an anonymous email was sent to several of Defendant's agents, including DCHS

1

principal Peggy Wright and Director of Schools Ron Dykes, as well as to local media outlets alleging that underclassmen football players had been "hazed in a sexual manner" at the football camp. After receiving the email, school officials investigated the allegations by interviewing a number of students who attended the camp. After this investigation, Defendant dismissed Plaintiff and three (3) other students from the football team and required them to attend alternative school for the entire upcoming academic year. Plaintiff alleges that the manner in which Defendant conducted the disciplinary process violated his due process rights and that he received an unreasonably harsh punishment because he was treated in the same manner as the other three students who participated in the hazing event despite having played a diminished role. Plaintiff asserts that as a result of Defendant's conduct, he is entitled to money damages.

Defendant takes the overarching position that the disciplinary proceedings complied with all due process requirements and did not violate any of Plaintiff's constitutional rights. Defendant further asserts that any claim brought under Tennessee Code Annotated § 49-6-3401 or other state statute or state common law applying to issues such as those raised by Plaintiff must be brought within sixty days of the disputed action via a writ of certiorari; thus, given that Plaintiff failed to bring suit within that timeframe, Defendant asserts Plaintiff's state law claims are time-barred. Defendant further contends that there is no right to a monetary recovery under Tennessee law or the Tennessee Constitution to address the damages Plaintiff states he sustained. Addressing more specifically Plaintiff's federal claims, Defendant takes the position that Plaintiff lost any right to take issue with Defendant's actions when he transferred to another school system during the disciplinary process; that Plaintiff had sufficient state remedies; and that Plaintiff had no liberty interest and failed to request a name-clearing hearing. Defendant lastly notes that punitive damages may not be awarded against a governmental entity, that Plaintiff was not denied

2

access to the educational process because he was offered an equivalent education at an alternative school, and that Plaintiff is not entitled to injunctive relief given that he has already been awarded a high school diploma.

## II.    PROOF

Plaintiff presented live testimony of eleven witnesses and eight Ex.s. Defendant presented live testimony of seven witnesses and thirty Ex.s. In addition, Defendant submitted the deposition testimony of an additional defense witness [Ex. 34]. The Court will summarize the relevant testimony below.[1]

### A.  Plaintiff's Proof

### 1. Testimony of John Doe

Plaintiff testified that he had been playing football since age 5 and it was "his life." Plaintiff described his grades as average and stated that he "got by" in the classroom but excelled at football. Plaintiff had an individual education plan ("IEP") in place at the time he was disciplined. He attended the Fellowship of Christian Athletes Football Camp ("the camp") as a member of the DCHS football team in July 2015, which was Plaintiff's second year attending the camp. When Plaintiff attended camp as a freshman another student, Jordan Way, who was then a junior, was assigned to be his mentor and they ultimately became "best friends."

Plaintiff further testified that when he attended the 2014 camp as a freshman, he was "initiated" onto the team by receiving what the upperclassmen called a "birthday spanking." Plaintiff explained that he was grabbed by upperclassmen who then began to smack his butt, and when he

_____

[1]  The Court acknowledges that portions of the testimony presented at trial were omitted from these summaries. They were excluded in the interest of efficiency, as those portions were duplicative or did not address the questions properly before the Court for resolution.

3

ultimately fell to the ground, they began "beating" him. Plaintiff stated that three other players also received "birthday spankings" at the 2014 camp.

Plaintiff stated that initiations also took place at the 2015 camp. He testified that Way came to him in the bathroom and told him the upperclassmen had decided how they were going to initiate the freshmen, but Plaintiff had to undergo the process first. Plaintiff did not protest being initiated a second time and, following Way's instructions, got down on his knees and put his head back. Way then "hit" Plaintiff on the forehead with his penis. Plaintiff testified that it was Way and another senior, Michael Moffitt, who devised this form of initiation. Moffitt was present when Way "initiated" Plaintiff but did not actively participate. Plaintiff explained that he thought this was a normal way to be part of the group and that "it didn't stand out as wrong at the moment."

After Plaintiff was "initiated" in the bathroom, he and Way returned to the room they were sharing while at the camp. A short time later, two underclassmen came into the room and were sitting on Way's bed when Way told them they were going to be initiated. One of the students tried to get up and Way told him he could not get up and instructed Plaintiff to hold his feet while he was initiated. Plaintiff stated the he followed Way's instructions and held the younger player's feet while he "got done." The second player did not resist and was not restrained.

Plaintiff testified that he was questioned about the hazing on two different occasions. DCHS Principal Peggy Wright and other school officials first questioned Plaintiff about the allegations of hazing on the Monday following the camp, without the presence of either of Plaintiff's parents. Plaintiff gave a written statement at that time [Ex. 8, p. 2] and denied involvement in the hazing. Plaintiff later gave a second, more detailed oral statement in which he admitted that he held someone's feet while they were being initiated. Plaintiff's father was present

during the second statement. Plaintiff further testified that no one told him what they thought he had done either time he was questioned and that he was never shown other students' written statements.

Plaintiff was initially suspended for ten days with the suspension[2] to be served at the alternative school. He was also dismissed from the football team for the 2015-2016 academic year. On cross examination, Plaintiff admitted that the same paperwork that contained his written statement also contained a field for "action taken," which was filled in with "10 day suspension— board hearing." [Ex. 8, p. 2]. At the same time, Plaintiff explained that he didn't really know what 'board hearing' meant and did not know the date or time of the board hearing until it was over. Plaintiff also testified that he did not understand that his suspension could be lengthened beyond the ten-day time period. Ultimately, Plaintiff's suspension was extended to the entire academic year at the board hearing.

Plaintiff was already familiar with the Washington County alternative school because he had attended school there for a portion of his eighth grade and then returned to his regular school. While attending alternative school during eighth grade, Plaintiff said that his assignments consisted solely of copying four to six pages front and back from any book that he wanted, and that there were no lessons, quizzes, homework or tests. When Plaintiff was sent back to the alternative school in 2015 as a result of the incident at issue, he only attended one day during his initial ten-day suspension before leaving. Plaintiff explained that he did not continue to attend in 2015 because Way and Moffitt were also serving suspensions there and he was concerned for his safety because they were placed in the same room with him. Plaintiff testified that there had been

---

[2] Defendant takes the position that Plaintiff was not "suspended" as that term is used under applicable federal law because Plaintiff was permitted to attend alternative school which Defendant alleges provides an equivalent education.

incidents between him and Way after the camp, including one instance where Way and Way's mother came to Plaintiff's house and Way attempted to physically fight Plaintiff. Plaintiff stated that the alternative school staff told him they would send him books so he could complete assignments at home and then he could return to regular classes at the end of the ten-day suspension; however, shortly thereafter Plaintiff moved and enrolled in school at Elizabethton High School ("EHS"). EHS enforced the discipline imposed by Defendant, requiring Plaintiff to attend their alternative school and prohibiting him from playing football for the 2015-2016 academic year.[3]

Plaintiff testified that he did not really learn anything while attending the alternative school in Elizabethton because the curriculum was all computer based and students were simply copying answers from one screen onto another. Plaintiff remained in the alternative school until the last month of classes, when he was permitted to begin attending regular classes. Plaintiff also began football and wrestling practice for EHS in March 2016. Plaintiff testified his grades at EHS were mostly C's and D's, but he ultimately graduated high school on schedule.

In his testimony, Plaintiff also described the harassment he suffered while at EHS and how he was suicidal for a time. He was referred to as "Crockett" or "Crockett kid" and the DCHS hazing incident was brought up to him often by both other football players and teachers, including teachers who did not have him in their class. Plaintiff testified about the images of a penis that were drawn on his car multiple times and how he was harassed in the community. He explained that this was because people in Elizabethton lumped him in with the upperclassmen at DCHS

---

[3] For clarity of the record, Plaintiff did play football on a private, non-school-affiliated team while attending alternative school.

who had put their penises on other students' faces given that Defendant had imposed the same punishment on him as it did the other students involved in the incident.

Despite his testimony on direct, on cross-examination Plaintiff admitted to stating during his deposition on June 27, 2017 that he loved attending EHS, was making good grades and had good friends at the school, creating a conflict between Plaintiff's testimony at trial and that provided during depositions which is difficult to reconcile. Plaintiff also admitted on cross examination that his suspension had not prohibited him from being able to obtain entry into the military or prevented him from attending college. Plaintiff testified that he was considering attending college in the near future.

### 2.Testimony of Jeremy Bosken

Jeremy Bosken, the head coach of the DCHS football team at the time of the hazing and subsequent investigation, was also called to testify by Plaintiff. He stated he first learned of the initiations/hazing that occurred after the team returned from camp and he saw the story on a local news website. According to Coach Bosken's testimony, no one on the DCHS football coaching staff, including himself, was aware of the initiations that were occurring during the camp, although the entire coaching staff "chaperoned" the camp.

Coach Bosken testified that 4-8 players were chosen by the team and approved by the coaches to be on the "leadership council" and these players were "strategically placed" in the dorms to promote safety, in addition to him having an open-door rule with players not being given keys to their dorm rooms to prevent locked doors. Of note, one such leader was Plaintiff's assigned mentor, Jordan Way, whom Coach Bosken described as a "great young man." Coach Bosken claimed the coaching staff did everything possible to properly supervise the players and

that the same protocol is still in use during the camp.  He also testified that there were no hazing

incidents reported before the one at issue in 2015 and had been none reported since.[4]

Coach Bosken provided multiple statements regarding the hazing incident, including to

the Department of Children's Services ("DCS").  Coach Bosken admitted to being heavily

criticized in the media, to publicly stating that he was not sure the hazing accusations were even

legitimate, and to publicly defending the football team. Coach Bosken testified that he was not

kept in the loop regarding the investigation of the hazing allegations and offered conflicting

statements regarding his knowledge of Plaintiff's alleged role in the hazing. Coach Bosken

testified that the boys who were hazers were removed from school but stated the school did not

disclose the names of any students involved in the hazing incident.  In light of Coach Bosken's

own conflicting statements during his testimony and other testimony taken, the Court concluded

that Coach Bosken was not being candid when he testified that he learned about the hazing event

at issue from a local news website and instead concludes that Coach Bosken was advised of the

incident before the team left the football camp.

### 3.Testimony of David Hammond

David Hammond, a member of the Washington County school board since 2010, testified

that at the August 2015 school board meeting he voted to approve the recommendation by

principal Peggy Wright that Plaintiff serve a one year suspension in the alternative school and

that he also be suspended from the football team for a year.  At the same time, he stated that he

was unable to specifically recall the meeting or any of the disciplinary hearings that took place

during the meeting in detail. Mr. Hammond testified to having a vague memory of Plaintiff's

---

[4]  Bosken was hired to coach at DCHS in 2013 and resigned in December 2016.

father and his attorney appearing at some board meeting but was unsure which meeting that they attended.

Mr. Hammond admitted that he made the motion to uphold Plaintiff's one-year suspension implemented by the board because he thought Plaintiff had committed sexual assault. He further testified that he had no specific memory of a Title IX violation being discussed nor did he "know much of anything about" Title IX but was sure that he had been provided with and reviewed the materials relating to the hazing incident as well as the appeal lodged by Defendant and another of the football players before he voted. At the same time, Mr. Hammond admitted that Plaintiff could not have presented any information that would have caused him to disapprove of Principal Wright's recommended punishment even though Principal Wright was in her first year as principal.

### 4. Testimony of Jeannie Baines Britton

Jeanie Baines Britton, the mother of Tate Smith, another football player who was suspended as a result of the hazing during football camp, testified that she spoke to assistant director of schools for attendance, discipline, and pupil placement, James Murphy, about the hazing allegations and that Mr. Murphy told her he could not go into detail about the accusations because all the students involved were minors. Ms. Britton said Mr. Murphy initially told her that her son was not accused of exposing himself, but she later learned this was incorrect. Ms. Britton also testified that she did not receive any formal notice of the disciplinary proceedings against her son but did discuss the proceedings with Mr. Murphy. Mr. Murphy told her there was no reason to go to the board hearing because there would be no decision on additional punishment until after the DCS investigation was completed and that neither she nor the attorney hired by her

son's father needed to attend. Ms. Britton also testified that Mr. Murphy advised her to transfer her son to another school district during the initial ten-day suspension.

On cross examination, Ms. Britton admitted that at the time of the investigation she had recently moved and had not provided her new address to the school because the school year had not officially started. Ms. Britton also testified that, while during the time of the investigation and disciplinary proceeding, she and her son's father had separated, there was a formal custody order in place which gave them both parents custodial rights and that the school secretary was aware of the family situation. She additionally noted that her phone number had not changed and was on file with the school but nobody from the school attempted to get in touch with her regarding her son's disciplinary proceedings.

### 5.Testimony of James S. Greene

James Greene was a volunteer assistant football coach and assistant team chaplain at EHS while Plaintiff was a member of the EHS football team. He testified that he knew Plaintiff was involved in a situation at DCHS and had been in alternative school, learning the details of the DCHS incident from television reports. Mr. Greene knew the hazing involved players putting their genitals on the faces of others but did not know the details of what each player was accused of doing. Mr. Greene initially thought Plaintiff was one of the victims of hazing but then his opinion changed, and he assumed Plaintiff was guilty of hazing other players at DCHS. Mr. Greene also testified that he observed Plaintiff being bullied by other EHS football players and that Plaintiff appeared sad and withdrawn but did have friends on the EHS team.

### 6.Testimony of Carol Annette Buchanan

Carol Annette Buchanan, a member of the Washington County School Board currently in her sixth year serving as a member, testified that she first heard of the football camp hazing

incident on the local news while she was hospitalized. She then checked her email and found the anonymous email which had been sent to numerous school officials and members of the media about the incident. Ms. Buchanan talked to her daughter about the incident, who was the same age as Plaintiff but said she did so only in her role as a mother because her daughter was asking about rumors she had heard.

Ms. Buchanan testified about receiving a phone call from Plaintiff's father. Ms. Buchanan stated that Plaintiff's father was upset and wanted Plaintiff's punishment reversed by the end of the day, was going to "do some appeals" and that he would be making national news if anything happened to Plaintiff. She said Plaintiff's father was also talking about having guns and carrying one at all times. She later clarified that although Plaintiff's father said he normally carried a gun, he also said that he had to remove all the guns from his house because Plaintiff had threatened to hurt himself. Ms. Buchanan stated that she did not call the police but notified the director of schools regarding this phone call in her capacity as a school board member to see if there was a school resource officer at the alternative school where she understood Plaintiff to be because of her concerns about the call with Plaintiff's father; however, Plaintiff entered a police report as Ex. 4 which indicates that Ms. Buchanan had requested that Plaintiff's father be prosecuted following the call. The Court notes the school resource officer apparently provided the information for the report, which may be the reason that a request for prosecution is reflected.

Ms. Buchanan testified that she attended the February 4, 2016 board meeting during which the board voted to uphold Plaintiff's one-year suspension recommended by principal Peggy Wright. Ms. Buchanan testified that she received and reviewed materials from both school officials and Plaintiff prior to the meeting but did not recall that Plaintiff was specifically alleged to have violated Title IX and was unable to articulate what behavior could result in a student

violating Title IX. She stated that her understanding of Title IX was that it simply meant that males and females had to be treated equally. Ms. Buchanan was aware Plaintiff was not accused of placing his genitals on another student and that Plaintiff was seeking reduced punishment for his involvement in the hazing.

Ms. Buchanan could not remember if anyone asked the Board of Education's attorney any questions before taking a vote but was able to authenticate the minutes from the meeting (Ex. 17), which made no mention of questions to the attorney. She confirmed that the minutes also would have reflected any discussion among the board members prior to the vote. Ms. Buchanan recalled that the board unanimously voted to uphold the suspension without any discussion, and specifically testified that her decision to uphold the suspension was based on information contained in the packet of materials provided by school officials prior to the board meeting.

Ms. Buchanan agreed that she never saw any evidence to contradict Plaintiff's claim that he was not told that he was facing the possibility of punishment beyond the initial ten-day suspension at the initial board hearing[5]. Ms. Buchanan also offered that she had asked director of schools Ronald Dykes' about the administration's due process requirements and was told that they had been fulfilled as to Plaintiff. She admitted that she did not ask any questions about what would constitute a violation of Title IX or inquire into the legal elements of sexual assault before deciding to uphold the recommended one-year suspension. Ms. Buchanan stated she did have adequate time to review all the information provided prior to the hearing.

---

[5] The "board hearing" referred to was not a hearing held by the School Board but rather to a disciplinary board that considers disciplinary action prior to any consideration of the matter by the School Board.

12

Throughout her testimony, Ms. Buchanan frequently refused to answer the questions asked of her in a direct manner. Additionally, portions of her testimony were contradictory, limiting to some extent the weight the Court affords that testimony.

### 7.Testimony of John Doe's Grandmother

Plaintiff's grandmother ("Grandmother"), who is a legal secretary, testified that she was very involved in Plaintiff's life and played a mother-type role after Plaintiff's parents separated when he was young. As a result, Grandmother was quite involved with Plaintiff's education. For a while she was a substitute teacher and bookkeeper for Jonesborough Middle School. Grandmother testified that Plaintiff was first sent to Washington County's alternative school when he was in eighth grade for disrespecting a teacher. She further testified that at that time, Plaintiff was initially told he would be placed at the alternative school for ten days but was instead kept there for almost three months. Grandmother stated that Plaintiff apparently got into trouble twice while in alternative school, but they were not told why and Plaintiff was ultimately sent home for a week without explanation. Grandmother stated during this time she attended a meeting with Mr. Murphy and one of the teachers in the alternative school. During this meeting, Mr. Murphy became angry and slammed his fist on the desk because the teacher would not agree with Mr. Murphy. Grandmother explained that after the hazing incident she wanted to get Plaintiff out of the Washington County school system because she felt that Plaintiff was in harm's way in the alternative school environment.

On cross examination, Grandmother admitted that her knowledge of the hazing incident as well as the subsequent investigation and disciplinary proceedings was limited to what she read on the paperwork she had seen and what she had been told by Plaintiff and Plaintiff's father or heard on the news. Grandmother did not attend the August 12, 2015 board hearing. Grandmother

13

testified that Plaintiff's father told her Mr. Murphy's assistant provided a note stating Plaintiff had until August 27th to file an appeal of the board's decision, but because she is a legal assistant she took the time to look at the statute and it said an appeal had to be filed within five days of the decision. She called central office and the alternative school on August 17th to clarify the deadline for filing an appeal but was unable to speak with anyone until the following day. Grandmother spoke to assistant director of schools Dr. William Flannery on August 18th and testified he told her not to listen to Mr. Murphy and to have the appeal paperwork turned in by 4:00 p.m. on the 18th. Grandmother turned in the appeal as instructed and Dr. Flannery accepted the appeal.

Grandmother testified that she did not think Plaintiff should have been placed in the Washington County alternative school with other boys who had threatened him. Grandmother further stated Plaintiff had also been hazed and victimized by these boys, despite having played a part in the hazing incident.

### 8. Testimony of Ronald Dykes

In 2015, Ronald Dykes was the Washington County Director of Schools. As director of schools, Mr. Dykes was an employee of the school board and was not a voting member. He explained that as director of schools he primarily explained the education process and the law to the school board and advised the board on issues that may come up and when to seek attorney advice. At the same time, later in his testimony Mr. Dykes said that he did not intend to interpret the law related to Plaintiff's discipline.

Mr. Dykes denied advising Annette Buchanan individually or the school board as a whole on the law with respect to the vote to uphold or overturn the punishment imposed against Plaintiff by the disciplinary board in August 2015. Mr. Dykes testified that he advised the board that they had the option to either uphold the decision of the disciplinary committee, modify the decision,

or grant a hearing. This advice was delivered to all board members via a group email in or around September 2015. Mr. Dykes did not advise the board of the option to overturn the punishment. When asked about why he omitted the option, he stated it was not necessary for him to do so because the school board members already knew what actions they were able to take regarding Plaintiff's punishment; however, he did not explain why he felt compelled to "remind" board members of some of their options, but did not feel it was necessary to remind them of *all* available options.

Mr. Dykes provided all school board members with a packet of the "due process" information related to the hazing investigation and prior disciplinary decisions. Mr. Dykes testified that this packet was assembled by Mr. Murphy at Mr. Dykes' request. He did not compile this packet himself or influence what went into the packet. Mr. Dykes did not recall reviewing the packet submitted by Plaintiff prior to the February 2016 school board meeting. Mr. Dykes did recall that the school board ultimately voted to uphold Plaintiff's suspension and did not grant the request for a hearing.

On cross examination, a number of subjects were explored with Mr. Dykes. In response to questions regarding his understanding of Title IX, Mr. Dykes stated that it covered a pervasive hostile environment and sexual assault. He also stated that any sexual assault automatically involves gender discrimination, and that by taking part in the hazing incident Plaintiff had violated Title IX. He also opined that Title IX requires school systems to keep a record of events that are alleged or believed to have violated Title IX. [6] Such records are to include a resolution

---

[6] Despite Mr. Dykes' testimony that the school is required to investigate all allegations of events that are alleged or believed to have violated Title IX, the Court notes that Plaintiff's claim that he was hazed at football camp during his freshman and sophomore years was never investigated. While Plaintiff's allegations were made after Principal Wright had concluded her interview process, she testified that she did not investigate Plaintiff's claim because no student she interviewed had corroborated Plaintiff's claims; however, the freshman

for such events and are subject to audit. Mr. Dykes also explained that "requests to address the board" is a standard agenda item for each school board meeting and provides an opportunity for any citizen to address the school board on a topic of concern. Mr. Dykes also testified that Plaintiff would have been eligible to enroll in the Washington County school system if he had moved back to Washington County after having served his imposed suspension in a different school district.

### 9.Testimony of Dr. William Robert Flannery

Dr. Flannery was the Assistant Director of Washington County Schools at the time of the 2015 football camp incident and subsequent hazing investigation. On direct examination, Dr. Flannery testified that he participated in the investigation of the alleged hazing questioning both the victims and alleged perpetrators. Dr. Flannery testified at trial that he had no memory of whether Plaintiff was told about the specific actions he was accused of taking regarding his alleged involvement in the hazing and subsequent discipline. He also did not recall whether Plaintiff admitted or denied involvement in the hazing during questioning.

Dr. Flannery testified he was on the disciplinary hearing board but only vaguely remembers what took place during the hearing and was unable to recall whether the specifics of Plaintiff's alleged conduct were addressed. During his deposition testimony, Dr. Flannery stated that he could not remember whether Plaintiff had a disciplinary hearing. Dr. Flannery admitted that he and Dr. Susan Kiernan were the disciplinary hearing authority for Plaintiff's August 2015 board hearing and noted that both are licensed LEA employees. Dr. Flannery did not know if Dr. Kiernan questioned any of the students involved. According to Dr. Flannery, James Murphy made the recommendation for punishment and Dr. Flannery was not consulted.

---

who had been hazed would not have been witnesses to the hazing and those who Plaintiff claimed had hazed him would not be expected to volunteer that they had done so without even being asked.

Dr. Flannery was unable to provide a specific definition of "conduct prejudicial to good order," which is included in the description of Plaintiff's conduct in the disciplinary paperwork.[7] Dr. Flannery testified he was at the February 2016 board meeting where the school board voted to uphold Plaintiff's suspension. He recalled seeing Plaintiff's attorney, Mr. Phillips, at the meeting, but did not remember seeing Plaintiff's grandmother there. He did recall speaking with Plaintiff's grandmother about appealing the board's decision but did not remember instructing her to be present at the next school board meeting to discuss the appeal.

During cross examination, Dr. Flannery explained that although he was a part of the disciplinary hearing authority at the initial level, anything that happened after the August 2015 disciplinary hearing was at the school board level and beyond his decision-making authority. He did not participate in the review of the disciplinary action at the school board level. In contradiction of his direct examination testimony, Dr. Flannery also testified that he recalled Plaintiff denied any culpability in the hazing when he was initially questioned. Dr. Flannery stated that Plaintiff was able to make a written response to the questions about the hazing; however, Dr. Flannery was unsure if Plaintiff made a written statement in his presence.

Dr. Flannery testified he was present when Plaintiff's father accompanied him to DCHS to talk about the hazing allegations but denied making any sort of deal for leniency in exchange for Plaintiff's truthfulness. Dr. Flannery did tell Plaintiff it would be better if he told the truth about what happened at the football camp. While it was standard operating procedure for a ten-day suspension to be served at the Washington County Alternative School, Dr. Flannery did not

---

[7] It should be noted that Plaintiff's conduct is also described as a violation of Title IX. Throughout the trial, Plaintiff's counsel asked each witness involved in the investigation and disciplinary process a series of questions regarding Plaintiff's alleged conduct and actions specifically defined as violations of Title IX. Each witness to whom these questions were posed provided responses that established that the allegations against Plaintiff did not include conduct that is defined as a violation of Title IX.

remember if this was explained to Plaintiff or Plaintiff's father when the initial ten-day suspension was imposed but stated that policy may be in writing somewhere.

Dr. Flannery stated the school system uses a standardized checklist form to ensure due process is provided by the disciplinary hearing authority. Dr. Flannery testified that he completed the due process checklist during Plaintiff's disciplinary board hearing. He stated he completed this form to make sure the hearing authority covered everything required under due process. This "due process form" Dr. Flannery completed during Plaintiff's hearing indicates that Plaintiff was not present during the hearing and that Principal Peggy Wright reported that she believed the facts of the interviews stood, but Dr. Flannery testified he did not believe the investigative file had been presented to the disciplinary hearing authority at the time of the disciplinary hearing. He then stated the investigative notes may have been there, but he did not recall looking through them. Dr. Flannery was able to recall that he and Dr. Kiernan privately discussed the information that was presented regarding the allegations against Plaintiff, despite not being able to remember what that information was, and the recommended punishment.

Some of the students facing punishment due to involvement in the football camp hazing did attend the disciplinary board hearing along with their parent(s). Dr. Flannery stated each of these students and parents was afforded an opportunity to speak during the board hearing, but at the same time could not remember what admissions, if any, were made by the other students or whether they were advised of the specific factual allegations against them. On August 19, 2015, Dr. Flannery sent an email to Jennifer Moore, assistant to Director of Schools Mr. Dykes. This email indicated Dr. Flannery had spoken with Plaintiff's father about appealing the disciplinary board decision and that Plaintiff's father had provided an Elizabethton address for all future communications. It is difficult for the Court to reconcile how Dr. Flannery's memory could be

so vivid about certain aspects of this matter at the time of trial when he had no apparent recollection of them during his deposition.

### 10. Testimony of James Everett Murphy, Jr.

Mr. Murphy was the assistant director of schools for attendance, discipline, and pupil placement in Washington County in 2015. He received a phone call from someone during the summer of 2015 alerting him of the football camp hazing allegations but does not remember who called. His recollection of the accusations was that some freshman players had been initiated by another player or players "sitting on their face." Mr. Murphy testified that four students were punished uniformly for their involvement in the hazing. Mr. Murphy told Principal Peggy Wright he would make the punishment recommendation on her behalf because that was his role in the hearing. The Director of Schools told Mr. Murphy what the recommended punishment was, and Mr. Murphy simply relayed that to the disciplinary authority. Mr. Murphy offered contradictory testimony on direct examination as to whether he knew that, unlike the other three students who were disciplined, Plaintiff had not been accused of exposing himself or touching anyone with his genitals at the time the punishment recommendation was announced to the disciplinary hearing authority. Mr. Murphy testified that he was sure the fact that Plaintiff was not accused of placing his genitals on another student came up after the initial board hearing, and he addressed this by including Plaintiff's father's objections to Plaintiff's punishment in the information provided to the school board. Mr. Murphy denied telling Plaintiff it would be easier on him if he told the truth.

Mr. Murphy testified that he sent a letter to Plaintiff's father on August 4, 2015 advising him of when the disciplinary hearing would take place. He stated this letter did not include the specific actions that Plaintiff was alleged to have taken and explained that Plaintiff would have

been advised of the specific accusations against him during the initial interview with the principal. Mr. Murphy admits that he was not present during this interview but stated he saw the paperwork from it which listed "hazing event at football camp," which he testified was proof that Plaintiff was advised of the specific allegations against him. This letter also did not state what punishment Plaintiff was facing or address Plaintiff's right to appeal the board's decision.

Mr. Murphy does not send out mail personally but stated his office staff prepares these letters and takes the mail to central office to be processed and sent to the post office. He also testified that he did not personally sign the letter at issue, and explained his name was signed by an assistant. Mr. Murphy admitted that there is no proof this letter was sent other than that the letter was not returned. A second letter was sent by registered mail after the disciplinary hearing to make sure the family was aware of the punishment. Mr. Murphy stated the letter advising of the date, time, and location of the disciplinary board hearing was not sent by registered mail because he did not have time to send the letter by registered mail and receive the card back within ten calendar days before the hearing as required by law. Mr. Murphy testified that it takes longer for mail to be sent certified rather than uncertified.

Mr. Murphy testified that he called Plaintiff's father early on the day of the hearing to advise him of the punishment recommendation prior to the hearing as promised. While Plaintiff's father alleges that Mr. Murphy agreed that Plaintiff should receive less punishment than that of the other accused students, Mr. Murphy did not recall making such a statement. He also denied advising anyone to enroll a student in another school or stating that if a student was enrolled in another school then they did not need to worry about attending the board hearing. Mr. Murphy testified that he never tells students or parents not to attend board hearings, but it is his normal practice to tell parents that the same action will take place whether they attend or not. He then

stated that what he really meant was the recommendation regarding discipline would be the same regardless of whether the student and parent attended but he could not say the outcome would necessarily be the same because parents and students who attend the hearings can speak, ask questions, and raise concerns. Regarding Plaintiff's hearing, Mr. Murphy had no specific memory of anything that took place outside of the information contained in the paperwork. He testified that if there had been verbal testimony it would have been reflected in the minutes of the hearing. Mr. Murphy recalled the board of education meeting attended by Plaintiff's father but testified that the board did not have to hold a closed hearing as Plaintiff's father requested unless they wanted to increase Plaintiff's punishment.

Mr. Murphy oversees the Washington County alternative school. He explained that the alternative school, commonly called "Midway" is in a separate building from any other Washington County school and consists of two separate classrooms, one for short stays and another for students who will be taught in the alternative school for an extended period. Midway serves students in grades 7 through 12 and typically has ten to twenty students at any given time. Mr. Murphy testified that there are no lectures or labs at Midway because students in various grades and enrolled in various classes are in the same classroom but said that the teachers do work individually with the students. There are three certified teachers and three teachers' assistants at Midway and students have access to computers inside the classrooms. Teachers in the alternative school assign grades as they see fit based on board of education grading policy. He testified many times students are better off when they go back into regular classes because all they have done in Midway is schoolwork. Mr. Murphy also testified that his position does not give him the authority to unilaterally add time to students' suspensions and that he "rarely" keeps students in the alternative school longer than their original suspension; however, he admitted

there may have been occasions where he kept a student an additional day if there was a disciplinary incident on the final day of alternative school. He stated he would have been in communication with a parent about extending the suspension.

Mr. Murphy was also asked whether he had any knowledge of the conversation between Plaintiff's father and School Board member Carol Buchannan. He testified that he understood that Plaintiff's father was carrying a gun and had stated that once he got to the alternative school by the time he was finished it would be national news. He testified that Plaintiff's father was in control of himself when he arrived at the school, that he did not feel threatened by Plaintiff's father, and that he does not believe Plaintiff's father to be a violent man.

Despite not being involved in the investigation into the hazing, Mr. Murphy was assigned by Dr. Dykes to address the media about the hazing allegations. Mr. Murphy testified that he never mentioned any student's name to the media or stated that one of the accused students transferred to EHS. He also did not describe the behavior in which the students were alleged to have engaged to the media or use the term "sexual assault." Mr. Murphy did tell the media that one student transferred to Sullivan County schools, where EHS is located.

### 11.     Testimony of John Doe's Father

Plaintiff's father ("Father") testified that Plaintiff began playing football at age 5 and worked at it seven days a week. Plaintiff struggled academically and was held back in kindergarten and placed on an IEP during elementary school. While Plaintiff was challenged in his schoolwork, he excelled at football, which provided him with an opportunity to be proud of himself. Plaintiff was happy when playing football and was a starter on the DCHS team as a freshman playing both offense and defense. Jordan Way was the best player on the DCHS team and took Plaintiff under his wing and they became very good friends and spent a lot of time

together.

Father testified he was first notified that hazing allegations were being made against his son by a phone call from one of the junior football coaches. Father wanted to find out if the allegations were true, so he went to DCHS and asked Coach Bosken. Coach Bosken reported Plaintiff had been questioned about the allegations and advised Father to speak to Principal Wright. Principal Wright told Father that Plaintiff had a part in the hazing but that no one was saying Plaintiff put his penis on anyone's forehead or face. Father said he was never told what Plaintiff was accused of doing, just what he was *not* accused of doing. Father was shown Plaintiff's written statement where he did not admit to any wrongdoing and was assured that if Plaintiff would tell the truth they would "go easy on him."

Father admitted that he took Plaintiff home and was "in his face" and was very upset about the hazing allegations. Father even threatened to spank Plaintiff with a belt if he did not tell him what happened at football camp. Plaintiff finally broke down and told Father that the upperclassmen hazed him first. Plaintiff also told Father that he did not want to go back to school and expressed suicidal thoughts, which led Father to remove all firearms from the house. Father returned to DCHS the next day and told Principal Wright that Plaintiff was a victim of the hazing. Principal Wright responded that there was no evidence that Plaintiff was a victim and Plaintiff should have said he was hazed earlier. Father testified that both Principal Wright and Dr. Flannery stated it was in Plaintiff's best interest to tell the truth because no one else was saying what happened at the camp and promised Plaintiff leniency in exchange for truthfulness.

Father gave conflicting testimony regarding how he learned of the disciplinary hearing, first testifying he found out about the disciplinary hearing in person from Mr. Murphy on August 6, 2015 but during cross examination stated he found out from Tonya Moffitt, the mother of

23

another suspended student. Father testified he did not receive a letter about the hearing, but he did receive mail at the Jonesborough address where it was purportedly sent during this time. According to Father, Mr. Murphy told him that Plaintiff would receive a ten-day suspension and would not be allowed to participate in school sports for a year and the board hearing was just a formality. Father further testified that Mr. Murphy told him he would let Father know if he needed to attend the board hearing. On direct examination, Father stated that he left this meeting with Mr. Murphy believing Plaintiff's punishment was settled and the board hearing was not important; however, on cross examination Father admitted to testifying during his deposition that Principal Wright told him the disciplinary board would have to determine whether Plaintiff's suspension would be longer than ten days and that he should attend the hearing. Father stated he did not think he would need to attend the hearing because he relied on assurances made by Mr. Murphy. Father's testimony regarding this important issue is virtually impossible to reconcile.

Father testified that on the day of the hearing he received a call from Mr. Murphy around 8:00 a.m. and Mr. Murphy told him the board had decided to suspend Plaintiff for one year, which was the same punishment the other students involved in the hazing would receive. Father went directly to the board of education office where he spoke with Tonya Moffitt in the parking lot. Father testified he did not go inside the building because Ms. Moffitt told him the room where the hearing was supposed to take place was empty. After the board hearing, Plaintiff's grandmother was given a handwritten note with the deadline to file an appeal and told they had either 14 or 21 days to file. Father later learned he only had five days after the hearing to file an appeal but was able to get the appeal in on time. After appealing, Plaintiff and Father were given a date to appear before the school board. Father says he was told he could have a closed forum to discuss Plaintiff's punishment; however, when Father got to the meeting it was an open forum.

The final decision on Plaintiff's appeal was eventually made in February 2016. Father did not attend this board meeting because he was out of the country for work.

Father testified the other students blamed Plaintiff for them getting in trouble and told Plaintiff that none of this would have happened if Plaintiff had not said anything about the hazing. According to Father, Jordan Way and his mother even threatened Plaintiff and Father and told Plaintiff everyone hated him. Plaintiff was afraid the other players would get together and hurt him. Father testified Plaintiff was not safe at Midway with the other suspended players, so he relocated Plaintiff to Elizabethton. They moved in with Father's boxing coach and Plaintiff enrolled in EHS. Father stated he continued going back and forth between Jonesborough and Elizabethton for a while after Plaintiff moved to Elizabethton before relocating full time himself and is unsure of the actual date they moved; however, Father verified that he sent a letter to the chairman of the school board on August 10, 2105 that stated he had decided to withdraw Plaintiff from DCHS and also testified in his deposition that Plaintiff moved at the end of July or beginning of August. Father provided school officials with updated contact information on August 19, 2015, but stated he was still receiving mail at his former address even after moving to Elizabethton. According to Father, Plaintiff was harassed and bullied  by students at EHS and belittled by his new coaches. A penis was drawn on the windshield of Plaintiff's car and on his football helmet. Plaintiff cried a lot while attending EHS and has not been the same since the football camp hazing incident. Father stated Plaintiff is not as confident or sure of himself as he once was and lost his innocence.

### B. Defendant's Proof

#### 1.Testimony of Tate Smith

Tate Smith testified he was one of four DCHS students suspended as a result of the football camp hazing. Mr. Smith described an altercation he witnessed at the camp between Plaintiff, an unnamed freshman, and an upperclassman named T.K. Hill during which Mr. Hill "body slammed" Plaintiff onto a bed. Mr. Smith said he did not believe the altercation he witnessed was an "initiation" or "hazing," and he did not view the freshman involved in the incident as being hazed. Mr. Smith testified that after the incident between Plaintiff and Hill, Coach Bosken pulled Mr. Smith aside to scold him, then instructed him to go to his dorm room for the rest of the night and Coach Bosken took no further action. Mr. Smith testified that he went back to his room and did not hear anyone tell Plaintiff he would be punished if he did not participate in the initiations.

Mr. Smith testified he initially received a ten-day suspension which he served at the Washington County alternative school. Smith was living with his father during this time and did not recall he or his father[8] receiving any papers regarding attending a disciplinary hearing and stated that he was unaware of the possibility that his suspension could be lengthened beyond 10 days. After serving the ten-day suspension, Mr. Smith learned his suspension had been extended for the entire school year. He then transferred to Chuckey-Doak High School in Greene County, Tennessee. Mr. Smith attended regular classes at Chuckey-Doak upon first enrolling but was also suspended from Chuckey-Doak once his Washington County transcripts arrived. Smith testified

---

[8] Apparently, due to family circumstances, Smith and his mother did not speak for a significant period after the hazing incident so he was not in communication with her regarding whether she received this information; however, Smith's mother, Jeannie Baines Britton, testified at trial that she did not receive information about the hearing.

he was not sure if he would have been allowed to continue attending alternative school in Washington County beyond his initial ten-day suspension if he had not transferred to another school district.

### 2.Testimony of Michael Scott Moffitt

Michael Moffitt was one of the four DCHS students suspended for participating in the football camp hazing. He denied threatening Plaintiff in any manner to get him to participate in the hazing incident at issue. Mr. Moffitt remembered being questioned by Principal Wright about the hazing but did not recall whether he was told about the specific allegations against him, although he admitted knowing what they were talking about as far as the allegations. Mr. Moffitt testified that he was initially told he would be suspended for ten days and have a board hearing. Mr. Moffitt testified that he was advised at the alternative school by Mr. Murphy when and where to attend the board hearing. Mr. Moffitt attended the board hearing with his mother and testified they were both given the opportunity to speak at the hearing. Mr. Moffitt and his mother arrived at the hearing together and left together and did not encounter Plaintiff's father at any point when they were attending the hearing. Mr. Moffitt was told at the board hearing his suspension would be extended to the entire school year.

Mr. Moffitt described an incident where a fellow football player, T.K. Hill, slammed Plaintiff against a wall and threatened him, which Moffitt assumed was because Mr. Hill did not want to see Plaintiff holding down freshman. Mr. Moffitt also testified that he knows the victims of the hazing incident and knows of no reason they would falsely report what happened and who was involved.

Moffitt received his high school diploma from DCHS after attending the alternative school during his senior year; however, he testified that the quality and level of education at

Midway was not even close to that of regular DCHS classes. There were no verbal lessons and essentially all work is done by reading and taking tests on a computer, which the computer grades.

### 3.Testimony of Thomas J. Seeley, III, *Esq.*

Thomas Seeley was legal counsel for the Washington County school system when the events in question took place. Mr. Seeley provided legal advice to the school board or director of schools when called upon to do so. He was present during the September 3, 2015 school board meeting but not regarding the matter of Plaintiff's appeal. Mr. Seeley first heard about the hazing incident and subsequent disciplinary proceedings at the September board meeting and had no advanced notice that it would be addressed during the meeting. The agenda from this meeting reflects that Plaintiff's father had made a request to address the board and Mr. Seeley explained that such requests generally result in a citizen having three to five minutes to publicly address the board about any topic of concern; however, when Plaintiff's father rose to speak he requested a closed hearing. According to Mr. Seely, Mr. Murphy took the position that Plaintiff's father was not entitled to the closed hearing requested. Because Mr. Seeley was caught off-guard about the hearing request, he asked for an opportunity to review the law on the issue before advising the board as to whether Plaintiff's father was entitled to a closed hearing.

Mr. Seeley and Plaintiff's counsel exchanged correspondence regarding Plaintiff's appeal and request for a closed hearing. In a letter Mr. Seeley sent to Plaintiff's counsel on September 17, 2015, he advised that there might not be a board hearing regarding Plaintiff's appeal, explaining that the school board was only legally required to hold a hearing if it intended to impose a more severe punishment than that which was handed down by the disciplinary committee at their "board hearing." Ultimately, the school board determined the best course of action was to review all information submitted by Plaintiff and DCHS officials regarding the

hazing allegations and subsequent investigation and disciplinary proceedings pertaining to Plaintiff and make a decision regarding Plaintiff's punishment based upon that information alone, but Plaintiff was provided with an opportunity to submit written information. During the February 2016 meeting the school board decided to uphold Plaintiff's one-year suspension based upon the written information before the board. No oral testimony was permitted because it was not required by law. Mr. Seeley testified he had no recollection of this meeting apart from the information contained in the meeting minutes and other related documents.

### 4. Testimony of Dee Lewis

Dee Lewis was an instructional assistant at the Washington County alternative school in 2015 and was an administrative assistant at the alternative school at the time of trial. Ms. Lewis met Plaintiff when he attended Midway during his eighth-grade year and got to know both Plaintiff and Father. She testified that she started work at the alternative school a few days before the first day of school in 2015 and that James Murphy, Ashley Adams, and some other employees started work prior to the first day of school as well. Prior to the official beginning of the school year, Plaintiff's father came to the alternative school and met with Mr. Murphy. Ms. Lewis was not present during that meeting, but stated she walked into Mr. Murphy's office on another occasion when Mr. Murphy and Plaintiff's father were discussing the hearing process on speaker phone.

Ms. Lewis talked to Plaintiff's father on multiple occasions about what happened at football camp and that Plaintiff was going to be back at Midway. He also spoke to her about Plaintiff being a victim of the hazing, Plaintiff's punishment, and the potential that Plaintiff would change schools. Ms. Lewis testified that she spoke with Plaintiff's father after he left the meeting with Mr. Murphy. On that occasion, Plaintiff's father had a letter that Ms. Lewis believed he was

given during the meeting. Ms. Lewis stated she discussed this letter with Plaintiff's father, which included the time and date of the board hearing and Father expressed concerns over whether he should attend the hearing if he was going to move Plaintiff to another school district. Ms. Lewis ran into Plaintiff at a restaurant in Jonesborough where he was working after he graduated from high school. She was excited to see Plaintiff and gave him and hug and he told her he was doing great.

### 5. Testimony of Ashley Adams

Ashley Adams was working as an instructional assistant and secretary at the Washington County Alternative school in 2015. She is still employed at the alternative school as a data entry clerk. Ms. Adams testified she did not begin work before the first day of school in 2015 but some of her co-workers did, including Mr. Murphy and Dee Lewis. Ms. Adams saw Plaintiff at the alternative school twice after the beginning of the 2015 school year and saw Plaintiff's father at least four times. She stated Father would come to the alternative school to speak with Mr. Murphy or his then-assistant, Cathy Evans.[9] Ms. Adams did not hear any of these conversations, but did note that on one occasion she saw Plaintiff's father leave Mr. Murphy's office with a paper that he did not have when he went into the office. Plaintiff's father then had a conversation with Dee Lewis. Ms. Adams also says she heard Mr. Murphy tell Plaintiff's father on one occasion that he could not advise him whether to attend the board hearing.

Ms. Adams was with Ms. Lewis when Ms. Lewis saw Plaintiff post-graduation. She confirmed that Plaintiff told them he was "doing good."

---

[9] Cathy Evans is now deceased.

### 6. Testimony of Dr. Susan Kiernan

Dr. Susan Kiernan was in her forty-third year with the Washington County School System at the time of trial. She was serving as the Assistant Director of Washington County Schools for Human Resources, Materials, and Purchasing in 2015, a position she had held since 2008. Dr. Kiernan did not participate in the investigation into the football camp hazing but was part of the disciplinary hearing authority that decided whether to adopt the recommended punishment for the students involved. She testified that the students and parents in attendance at the August 12, 2015 board hearing were given an opportunity to speak to the board. Dr. Kiernan further stated that the board independently decided that a one-year suspension to the alternative school was an appropriate punishment. Dr. Kiernan estimated she has participated in 40-50 disciplinary hearings since 2001 and could not remember any instances in which the disciplinary hearing authority did not adopt the school's recommendation for punishment.

A number of the school board's policies were admitted through Dr. Kiernan's testimony. She also specifically noted that one of those policies allows the school board to hold a hearing when a student has been suspended and the resolution is unsatisfactory.

### 7. Testimony of Peggy Wright

Peggy Wright was the newly appointed principal of DCHS in 2015 when the hazing allegations were made and still held that position at the time of trial. She previously served as a teacher for twenty-five years and had prior experience as a vice-principal.

Principal Wright initially learned of the football camp hazing when she received the anonymous email that was also sent to additional school officials and members of the media. Principal Wright immediately contacted the DCHS athletic director and football coaches and asked them to come to her office. She also contacted Central Office to notify them she was

beginning an investigation. Despite Coach Bosken's assertion in his testimony that he knew nothing about the hazing allegations until he and the players returned from camp, Principal Wright testified that Coach Bosken advised her there were rumors at football camp that something happened, and he had questioned some of the younger players but did not get any information. Principal Wright instructed Coach Bosken to bring the players in to give statements. Approximately ten players were brought in one at a time to give statements on what happened at football camp. Principal Wright said the students were mentioning the same four names over and over, which is how she determined which students should be disciplined. She further noted that all students identified as having a role in the hazing were punished for their participation. Principal Wright also advised that she was not aware of any other hazing events which had taken place regarding the football team.

Principal Wright testified that Plaintiff initially denied involvement in the hazing but stated that he had heard about it and mentioned Jordan Way and Michael Moffitt as being involved. None of the four accused hazers admitted to being perpetrators of the hazing but each was given an opportunity to tell their story. Principal Wright also stated that she was confident the students knew what conduct was being investigated. Principal Wright confirmed that when she initially spoke to Plaintiff's father about the hazing, she told him not to overreact and to wait and see what happened. She denied making any promises of leniency to Plaintiff or Plaintiff's father but recalled telling all the implicated students they should tell the truth about what happened at football camp. She also testified that Plaintiff never admitted holding anyone's feet down during the hazing and does not recall telling Plaintiff anyone said he did so. In fact, Principal Wright was unable to remember what she told Plaintiff about how it was alleged he participated in the hazing.

Principal Wright testified that all due process forms she gave to the disciplined students indicated there would be a board hearing. These disciplinary board hearings are held within the period of the initial suspension as a matter of course and the hearings are scheduled by James Murphy's office. In this case, all the board hearings were held on August 12, 2015 and Principal Wright was present. The students and parents were not advised prior to the hearings that the students were facing a one-year suspension. The findings from her investigation were provided to the hearing officers for review and the officers were able to ask questions about the investigation. Principal Wright explained she recommended the alleged hazers be suspended for the entire school year because she did not want the freshman who were victims of the hazing to have to be in school with the alleged perpetrators. She conferred with Mr. Dykes and Dr. Flannery in determining an appropriate punishment but did not recall consulting with Mr. Murphy. According to Principal Wright, students who spend an extended time in alternative school can re-integrate into regular school campuses. She testified that some students do better in alternative school and even experience improved performance once they re-integrate into regular classes.

On cross examination, Principal Wright testified that she first learned that Plaintiff also claimed to be a victim of the hazing in her last meeting with Plaintiff's father. She stated Plaintiff did not mention being a victim when questioned about the hazing but acknowledged that he had not been asked if he was a victim. No further investigation was made into the report by Plaintiff's father that Plaintiff was a victim of hazing at football camp. Principal Wright stated this was because there was no evidence to suggest Plaintiff had been a victim other than Father's statement; however, she admitted that another parent had reported their child was a victim of hazing and the student was questioned about being victimized in response. Here, school officials never asked Plaintiff if he was a victim of the hazing.

## C. Deposition Testimony of Jordan Way Submitted for Proof by Both Parties

Excerpts of Jordan Way's deposition testimony were presented for proof at trial on behalf of both parties. At the time of trial, Mr. Way was incarcerated outside the county and the parties stipulated to his unavailability for trial. Jordan Way was the last of the four football players suspended as a result of the hazing incident at issue. He was on probation at the time of his deposition and initially reluctant to answer questions. Ultimately, Mr. Way did respond to the questions asked noting that the hazing incident "ruined" his senior year. He testified that he knew what he was accused of stating that "they" put it all over the news. Mr. Way stated he learned of the allegations when the coach brought him and others into the office. He acknowledged that Principal Wright was there as well. Mr. Way testified that he thought he got a "raw deal" in being suspended from the football team for his senior year and sent to the alternative school. He did attend alternative school in Washington County both at Midway and Asbury and graduated early.

Mr. Way further acknowledged that he was given a board hearing and an opportunity to speak at the hearing but did not feel that he was given the opportunity to be heard to a meaningful degree. He also stated that he believed that the statements friends of his submitted in support of him were ignored in the disciplinary process. While Mr. Way denied that the hazing incident happened in the way alleged and stated he had not exposed himself or placed his genitals on anyone else, he also refused to say what had happened stating that he had "moved on" and did not want to relive that moment.

Mr. Way did testify that he never threatened Plaintiff with harm to get him to participate in hazing. He also stated that the coaching staff knew to some extent what was going on at camp. Mr. Way said the staff generally stayed in their own little room, but they did walk the halls a

34

"little bit." He further testified that the coaching staff should have stopped what was going on at the camp.

Mr. Way denied that there had been any resentment or ill will between him and Plaintiff since the hazing incident issue arose. He stated that Plaintiff's father might have had some ill will.

Mr. Way was also questioned about when he learned that he would be out of school for a year as opposed to ten days. Defendant's counsel objected to the question stating that the ten days was a "suspension" while the year is "alternative school." Mr. Way said that he was advised prior to the board hearing that he could be facing a year's suspension but that he did not learn it from any principal, assistant principal, Mr. Murphy or Principal Wright. He said he talked to his baseball coach, Coach Hagy, about it. Upon further questioning he said that Coach Hagy was "pretty much" a principal. Mr. Way testified that he thought he knew about the board hearing because he got something in the mail.

Overall, the Court found Mr. Way's testimony to be largely self-serving and generally unreliable. He refused to give direct answers to the questions asked and a number of the answers he gave simply did not make sense.

### III.     Defendant's Motion to Dismiss

At the close of Plaintiff's case-in-chief, Defendant made an oral motion for involuntary dismissal. Defendant argued that Plaintiff's state law claims are time-barred, or, in the alternative, that the only appropriate remedy would be to remand Plaintiff's disciplinary issue to the school board which is no longer a valid option since Plaintiff has graduated high school. Regarding Plaintiff's federal due process claims, Defendant argued that Plaintiff failed to meet the standard to establish either a liberty or property interest as required to pursue such claims. Defendant

35

additionally argued that Plaintiff must show an absence of adequate state remedies in order to succeed on these claims and had failed to do so. The Court denied Defendant's motion.

## IV.    ANALYSIS

There is little on which the parties agree in this case, but the Court will first outline the few relevant facts which are undisputed.  Plaintiff began attending David Crockett High School ("DCHS") in the 2014-2015 academic year as a freshman and was a member of the football team throughout his time at the school. Plaintiff was a standout football player but struggled academically. In the summer immediately preceding Plaintiff's sophomore year, the DCHS football team attended a camp at Tennessee Tech (the "camp") which was sponsored by the Fellowship of Christian Athletes.  Upon the team's return from camp, an unidentified person sent an anonymous email to members of the Washington County School Board and certain local media outlets claiming that some of the freshman football players had been hazed during the camp and demanding the perpetrators be punished.  *See* Ex. 1.  Plaintiff ultimately admitted that he played a role in this hazing event by holding the feet of a certain freshman while fellow members of the football team placed their genitals on the face of the freshman football player. Plaintiff was initially sent to the alternative school for ten days and was advised that he could not play football during the coming school year; however, after a disciplinary board hearing Plaintiff's punishment was increased to a full school year at the alternative school.

While it was clear during trial that Plaintiff and his family believe his punishment was too harsh given the role that he played in the hazing, as referenced above, the issue before the Court is whether Plaintiff was provided with due process during the disciplinary process and, if not, whether Plaintiff suffered a compensable injury as a result.

The Court acknowledges the difficulties Defendant likely experienced in addressing this

matter while facing intense scrutiny from the media at a time when hazing incidents such as the one at issue were a media focus across the country. Undoubtedly, Defendant would have felt significant pressure to quickly investigate this matter and punish those it found to have been involved in any hazing incident that may have taken place. No one can dispute Defendant's duty to fully investigate the allegations and appropriately punish any student who hazed a fellow student at a school-sponsored event. As the Washington County Department of Education High School Handbook aptly notes in the "Conduct" section, for a school environment to be conducive to learning it must be safe. *See* Ex. 2, p. 18. Defendant must balance the responsibility to maintain that safe environment with its duty to ensure that no student is disciplined without first being provided with due process protections to ensure that the student is in fact guilty of the act of which he or she has been accused because of the significant harm removing a student from the regular classroom environment can have on the student's reputation and educational opportunities. When a notation of discipline is entered onto a student's permanent record, he or she carries that throughout life.

Defendant claims that this Court should not address the facts of the case because a portion of Plaintiff's claims are time-barred and the Court does not have jurisdiction over the remainder.

### *Jurisdiction of the Court*

Plaintiff claims that Defendant breached duties imposed upon it by Tennessee Code Annotated § 49-6-3401. Defendant argued in its pretrial brief as well as in its motion to dismiss that the Court does not have subject-matter jurisdiction over these claims because they were not timely filed. Defendant correctly contends that in the absence of any other plain, speedy, or adequate method for obtaining judicial review of an adverse disciplinary decision, students, either individually or through their parents may seek judicial review using a common-law petition for

writ of certiorari authorized by Tenn. Code Ann. § 27-8101 after they have exhausted all the administrative remedies available to them. *Heyne v. Metro. Nashville Bd. Of Public Educ.*, 380 S.W.3d 715, 728 (Tenn. 2012); *see also Link v. Metro. Nashville Bd. Of Public Educ.,* No. M2013-00422-COA-R3-CV, 2013 WL 6762393 at *6 (Tenn. Ct. App. Dec. 19, 2013). The Court agrees with Defendant's assessment that claims pertaining to the appropriateness of Plaintiff's punishment should be brought via a writ of certiorari; however, this argument incorrectly interprets Plaintiff's claim as a request for review of Defendant's decision regarding the discipline imposed upon Plaintiff for his involvement in the football camp hazing. The Court views Plaintiff's claim as one alleging that Defendant violated duties imposed by the statute during the disciplinary process rather than seeking judicial review of the actual punishment imposed. While Plaintiff did contend throughout trial that his discipline was too harsh, that contention was part of an overall argument that the disciplinary process was not handled in a constitutionally and statutorily appropriate manner. Because the Court is not reviewing the appropriateness of the punishment imposed but the procedure Defendant used to discipline Plaintiff, the Court finds that Plaintiff was not required to bring this action via a writ of certiorari. To the extent Plaintiff intended for the Court to review the punishment imposed and assess the propriety of that punishment in light of his conduct, the Court finds that claim is time-barred.

The Court is authorized to exercise supplemental jurisdiction over Plaintiff's state law claims as they arise from the same nucleus of facts as his federal due process claims. *See* 28 U.S.C. § 1367; *Home Depot U.S.A., Inc., v. Jackson*, 139 S. Ct. 1743, 1753 (2019); *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). For that reason, Defendant's assertion that the Court does not have jurisdiction over Plaintiff's state law claims is without merit.

*Plaintiff's Claims under Tennessee Code Annotated § 49-6-3401*

Plaintiff claims that Defendant's process violated state law in the following ways:

1) Defendant failed to provide notice of intent to impose further penalty beyond the initial ten-day suspension as required by T.C.A. § 49-6-3401(c)(4)(A-B); and

2) Defendant failed to give written notice of the time and place of the hearing in violation of T.C.A. § 49-6-3401(c)(4)(D).[10]

Defendant contends that even if this Court has jurisdiction over Plaintiff's state law claims and those claims are not time-barred, Plaintiff's claims must fail because Defendant complied with the state law requirements at issue.

Addressing first Plaintiff's claim that Defendant did not provide notice of its intent to impose further penalty beyond the addition suspension as required, the Court notes that the Due Process form provided to Plaintiff refers to a board hearing but offers no information about the purpose of that hearing. *See* Ex. 8. The Washington County Department of Education High School Student Handbook also provides no guidance on the subject. *See generally* Ex. 2.

Defendant also relies upon a Notice of Suspension that Defendant claims was provided to Plaintiff's father, which Plaintiff's father disputes receiving. That notice states that Plaintiff was suspended for ten days for "[i]mmoral or disreputable conduct, including vulgar or profane language." Ex. 8, p. 4. The Notice does provide the types of conduct for which students may be suspended and potential punishments but does not in any way indicate that Plaintiff's punishment might ultimately be extended beyond the ten-day suspension for which notice was provided. *Id.*

Defendant also claims a letter was sent to Plaintiff's father advising him of when the board

_____

[10] Plaintiff also initially claimed that Defendant failed to follow state law because it did not have at least one licensed employee of the LEA on the disciplinary board that handed down Plaintiffs punishment; however, the testimony at trial made it clear that Defendant did meet this requirement.

hearing would take place to address issues relating to Plaintiff's discipline, which Plaintiff's father also denies receiving. The Court first notes that the description of the "charge" against Plaintiff in this letter is that "he behaved in a manner prejudicial to good order and discipline," which is different from both the description contained in the "due process" packet and the charge set forth in the suspension notice. *See* Ex. 8, pp. 1, 4, and 6. The only information as to punishment contained in the letter is that the hearing committee would be considering the recommendation of Principal Wright. *Id.* at p. 6. At that time, the only documentation Plaintiff had been provided as to any recommendation from Principal Wright was the ten-day suspension referenced in the due process packet given to Plaintiff. Plaintiff's father did admit on cross-examination that Principal Wright told him that the disciplinary board would ultimately determine whether Plaintiff's suspension would be longer than ten days. However, Principal Wright testified that prior to the hearing she did not advise Plaintiff, nor the other students disciplined as a result of the hazing event, that they may be facing a one-year suspension. Under the totality of the circumstances, the Court finds that Defendant violated the notice provision imposed by statute.

The testimony as to whether this letter was sent by Defendant and received by Plaintiff's father is quite contradictory. The letter at issue was purportedly sent by Mr. Murphy's assistant. While it appears to contain his signature, testimony showed that his assistant signed his name with permission to all such letters. Unfortunately, Mr. Murphy's assistant at the time of the events in question died prior to trial and was not available to testify as to whether the letter was actually sent. Mr. Murphy states that the only "proof" he has that the letter was sent is that it was not returned to him. Interestingly, Ms. Lewis, who worked for Mr. Murphy, testified that she spoke with Plaintiff's father in person on several occasions and noted that on one of those occasions she

saw Plaintiff's father with a letter that she believed had been given to him during a meeting with Mr. Murphy that included the date and time of the board hearing. Ms. Adams also testified that Plaintiff's father left Mr. Murphy's office with a piece of paper on one occasion that he did not have when he went in to meet with Mr. Murphy; however, Mr. Murphy gave no indication that he provided Plaintiff's father with a letter about the hearing in-person.

What does not appear to be disputed is that Mr. Murphy called Plaintiff's father on the morning of the board hearing to advise him that Principal Wright was going to recommend that Plaintiff be suspended for the remainder of the school year. Plaintiff's father testified that upon learning this information he went to the location of the hearing, but nobody was present. While Defendant attempted to show that Plaintiff's father was being untruthful with his testimony, neither counsel addressed the issue of the time of arrival of Plaintiff's father for the hearing versus the time the hearing was scheduled to begin. Plaintiff's father testified Mr. Murphy called him at approximately 8:00 a.m. and that after their brief conversation he went directly to the hearing location. This is consistent with Mr. Murphy's testimony that he called Plaintiff's father "early" on the day of the hearing. However, the hearing did not actually begin until 9:45 a.m. If Plaintiff's father had not received Mr. Murphy's letter and arrived at the location shortly after an 8:00 a.m. phone call, it is certainly possible that Plaintiff's father arrived before any of the board members and believed that no hearing would take place.

As referenced above, the testimony of Plaintiff's father as to the issue of notice is difficult to reconcile. While he was steadfast in denying that he received the letter Mr. Murphy said he sent, he admitted knowing about the hearing from the parent of another student who was disciplined. Had Plaintiff's father not been in communication with school personnel so extensively leading up to the hearing, the Court would certainly conclude that Plaintiff's father

simply chose not to attend the hearing, but under these circumstances the Court is more inclined to conclude that Plaintiff's father appeared at the wrong time. Still, the evidence is insufficient to find that Defendant failed to provide notice to Plaintiff under the totality of the circumstances.

## Due Process

### *Plaintiff's Claims Under the Due Process Clause of the Fourteenth Amendment*

Plaintiff alleges Defendant deprived him of procedural due process by each of the following acts or omissions, or, in the alternative, by the sum of these acts or omissions:

1) Failure to provide advanced noticed and/or written notice of intent to increase Plaintiff's suspension to more than ten days;

2) Failure to provide Plaintiff/parent written notification of the time and place of any review;

3) Failure to inform Plaintiff of the specific actions he was alleged to have taken;

4) Failure to provide Plaintiff with an opportunity to be heard; and

5) Failure to review Plaintiff's written arguments in lieu of permitting Plaintiff to make oral arguments.

### *Property Interest*

The Fourteenth Amendment guarantees that no person will be deprived of life, liberty, or property without due process of law. U.S. Const., amend. XIV; *Goss v. Lopez*, 419 U.S. 565, 572 (1975). In order to succeed on a due process claim, Plaintiff must first establish a property or liberty interest that entitles him to due process protection. *See Goss*, 419 U.S. at 572-73. Children in Tennessee are statutorily entitled to a free public education, and a compulsory attendance law requires children in Tennessee between the ages of six (6) and seventeen (17) years to attend either public or non-public school. Tenn. Code Ann. § 49-6-3001. Although Tennessee is not

constitutionally obligated to establish and maintain a public-school system, because it has chosen to do so and to require attendance by law, "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id.* at 574.

### *Suspension to Alternative School as Deprivation of Property Interest*[11]

Defendant makes a two-fold argument as to why Plaintiff was not deprived of any property interest. Defendant first takes the position that Plaintiff was not actually suspended from school but was simply relocated to the alternative school where he was provided an education of substantially similar quality. The Sixth Circuit has previously held that a student is not entitled to procedural due process for the sanction of attending an alternative school "absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school." *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1359 (6th Cir. 1996). At the same time, the Sixth Circuit has found that under certain circumstances in-school suspension could constitute as much educational deprivation as an actual suspension or expulsion. *Laney v. Farley*, 501 F.3d 577, 581-82 (6th Cir. 2007).

> The primary thrust of the educational process is classroom instruction; in both situations the student is excluded from the classroom. This is not to say that any in-school detention would necessarily be equivalent to a suspension; it would depend on the extent to which to student was deprived of instruction of the opportunity to learn.

---

[11] Part of Plaintiff's punishment also prevented him from playing football or attending school activities. "In Tennessee, like the majority of jurisdictions, the right to participate in athletics is considered to be a mere privilege. Because there is no legal right to participate in sports, participation in interscholastic athletics is deemed to fall outside the protection of the due process clause of the Fourteenth Amendment." *Bean v. Wilson Cty. School Sys.*, 488 S.W.3d 782, 790 (Tenn. Ct. App. 2015).

*Id.* at 582. This same reasoning could be applied to attending alternative school. *But see Jahn v. Farnsworth*, 617 F. App'x 453, 461 (6th Cir. 2015) (holding that imposition of a suspension for the remainder of the school year during which the student would have been allowed to finish classes from home and obtain his high school diploma as scheduled did not merit characterization as expulsion).

While Defendant claims that the alternative school education was substantially similar to that provided by DCHS, the proof demonstrated that students in the alternative school were primarily parked in front of a computer and received no classroom instruction. Both Plaintiff and Michael Moffitt credibly testified as to the lack of instruction provided by the alternative school. While Defendant offered testimony through at least two of its witnesses that sometimes students did better in the regular school population after attending the alternative school and that there were licensed teachers and teacher's assistants available to students as a resource, Defendant provided no proof to contradict the testimony of Plaintiff and Moffitt that they were primarily left to learn on their own without educational instruction. The Court does not find that Defendant provided an education of similar quality to students at the alternative school; thus, Defendant's initial suspension of ten days and subsequent suspension of one year to the alternative school were the type of property-interest deprivation that compelled the School System to provide Plaintiff with due process before the discipline was imposed.

### *Impact of Plaintiff's Transfer on Property Interest*

Defendant also argues that when Plaintiff transferred to another school district prior to the conclusion of Defendant's disciplinary process he waived any property interest he might have otherwise had. Defendant's claim overlooks the fact that Plaintiff remained enrolled in the Tennessee public school system and the school system into which Plaintiff transferred enforced

44

the disciplinary action that Defendant imposed against Plaintiff in its district as well. T.C.A. § 49-6-3401(f) makes it clear that the discipline a student receives in one Tennessee school district can adversely impact that student in another district. In fact, a Tennessee school district may deny admission altogether to a student under suspension or expulsion from another school district inside or outside of the state. *Id.* Additionally, Mr. Dyke's testimony demonstrated that Plaintiff would have been permitted to transfer back to the Washington County School System had he chosen to do so; therefore, the Washington County School System's decision continued to impact his educational opportunities in that school district as well. For these reasons, the Court cannot find that Plaintiff's transfer constituted a waiver of his property interest.

### *Liberty Interest*

The minimal requirements of the Due Process Clause must be satisfied "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Goss*, 419 U.S. at 574 (quoting *Wisconsin v. Constanineau*, 400 U.S. 433, 437 (1971)). In *Goss*, the Court held that charges of misconduct against a student by school officials that led to a suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* at 575. *But see Paul v. Davis*, 424 U.S. 693, 710 (1976) ("[A]ny harm or injury to that interest [of reputation], even where as here inflicted by an officer of the State, does not result in a deprivation of any liberty or property recognized by state or federal law, nor has it worked any change of respondent's status as theretofore recognized under the State's laws."). The proof offered at trial established that Plaintiff's reputation suffered as a result of the disciplinary proceedings related to the hazing incident. Therefore, the Court finds that Plaintiff also has a valid liberty interest upon which to base his claim.

45

### *Minimal Due Process Required*

When a student is suspended from public school for disciplinary reasons, due process requires that "the student be given oral or written notice of the charges against him and, if he denies them, and explanation of the evidence the authorities have and an opportunity to present his side of the story." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978) (quoting *Goss*, 419 U.S. at 584); *see also Jahn v. Farnsworth*, 617 F. App'x 453, 460 (6th Cir. 2015) (holding that due process requires that the school system or administrator explain the evidence of the student's wrongdoing and give the student an opportunity to present his version of the facts.). *Goss* describes the minimal requirement of "an informal give and take between the student and the administrative body dismissing him that would, at least, give the student the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.* at 86 (citing *Goss*, 419 U.S. at 584 (internal quotations omitted)). The Supreme Court has frequently emphasized that the very nature of due process requires a certain degree of flexibility and does not lend itself to a rigid structure with universal applicability. *Id.*; *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961). While the Supreme Court has stopped short of requiring a formal hearing in the context of every school suspension, reasoning that further formalizing the suspension process could escalate the adversarial nature of a suspension making it too costly to use as a form of regular discipline and also "destroy its effectiveness as part of the teaching process," the Court also noted that "[l]onger suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 583-84.

Throughout the trial of this cause, Defendant's witnesses repeatedly referred to the "Due Process packet" that was utilized in relation to Plaintiff's discipline and asserted that by use of this packet Plaintiff was automatically provided with due process; however, the mere labeling of

a set of documents with the phrase "due process" does not ensure that the information contained therein comports with due process requirements. As the Supreme Court made clear in *Goss,* a student is only to be disciplined after first being provided with "notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581. That information can be provided orally or in writing, but it must be provided. *Id.* Plaintiff testified that he was not told what he was alleged to have done wrong either time that he was questioned about the hazing incident. While Principal Wright testified that she was confident Plaintiff knew what he was accused of doing, she also testified that she could not remember what she told Plaintiff about the allegations against him. Plaintiff was provided with a copy of the "Due Process" form, but in looking to that form, the only information it contains under the nature of offense portion is: "Hazing incident at Football Camp, Cookeville, Tenn. July 14-16." Ex. 8. The document contains no information about what hazing was alleged to have taken place or what part Plaintiff was alleged to have played in the incident. Additionally, the disciplinary hearing notes from Plaintiffs' board hearing state for the first time that the charge against him was "conduct prejudicial to good order and discipline in that he was involved in a hazing incident. This incident is a violation of Title 9 and is viewed to be reprehensible behavior and sexual assault." Ex. 8, p.8.

Plaintiff may well have had some idea of what part he was alleged to have played in the hazing incident and who he was accused of hazing but that is not a substitute for Defendant informing him of the role he was accused of playing and the evidence of his conduct for the purposes of imposing discipline against him. The Court finds that Defendant did not meet its constitutional obligations to Plaintiff in terms of advising him of the allegations against him,

47

including the evidence Defendant had in support of those allegations such that Plaintiff could effectively respond to them.

### *Respondeat Superior*

While Defendant takes the position that it provided Plaintiff with due process, it also says that if it did not do so, it was the improper actions of individual employees who were responsible, and Defendant cannot be held liable for their failure. Defendant correctly asserts that government bodies may not be held liable under a theory of *respondeat superior* simply because an employee is a tortfeasor; however, local governments and governmental entities may be held liable for constitutional violations committed pursuant to government custom, even if such custom has not been formally adopted or approved through official decision-making channels. *Monell v. Dept. of Soc. Svs. of City of New York*, 436 U.S. 658, 690-93 (1978). As a result, even if the actions of the school board members did not conform with official policy, if this was the way things are normally handled the school board can still be liable under the customary practice exception despite having a formal policy in place that facially protects constitutional rights.

As set out above, Defendant's failure to provide Plaintiff with notice of the conduct he was alleged to have committed and the evidence it had in support of those allegations as well as its failure to notify Plaintiff that his suspension might be extended to a full school year, did not pass constitutional muster; however, these are not the due process violations that most concern the Court. What most concerns the Court was the "rubber-stamping" of Principal Wright's recommendation by the disciplinary committee and the school board's subsequent rubber-stamping of the disciplinary committee's findings.

In the hearing notes from Plaintiff's disciplinary hearing, the charge against Plaintiff indicated that he had committed a violation of Title IX and engaged in sexual assault, but the notes contained no findings as to how he had done so. Ex. 8, p. 8. Drs. Flannery and Kiernan were the hearing panel members and Dr. Flannery was responsible for the checklist generated as a result of the hearing. Dr. Flannery could not recall whether Principal Wright's investigative notes were present at the hearing, but Principal Wright testified that they were. Dr. Kiernan did not address the presence of the notes but did testify that she and Dr. Flannery independently decided that a one-year suspension was the appropriate punishment for Plaintiff. Dr. Flannery also testified on direct examination by Plaintiff's counsel that he could not recall whether the specifics regarding Plaintiff's alleged conduct were addressed during the disciplinary hearing and then on cross examination testified that he recalled discussing the specifics of his alleged conduct with Dr. Kiernan, presenting an irreconcilable conflict in his testimony.

The notes from the disciplinary hearing do indicate that Drs. Flannery and Kiernan discussed Principal Wright's recommendation privately and concurred with her recommendation of a one-year suspension, but the minutes reflect no fact-finding on their part. *Id.* They also do not indicate what specifically they found Plaintiff to have done wrong or why they determined that Principal Wright's recommended punishment was appropriate. [12] *Id.* Additionally, Dr. Flannery was unable to even provide the meaning for "conduct prejudicial to good order" during his testimony, which is purportedly the conduct he and Dr. Kiernan found Plaintiff to have engaged in warranting his suspension for one-year. Dr. Kiernan also admitted that despite being involved in forty to fifty disciplinary hearings, she could never recall a time

---

[12] Tennessee Code Annotated § 49-6-3401(c)(6) requires a disciplinary hearing authority to make a written record of such proceedings "including a summary of the facts and the reasons supporting the decision."

when the hearing authority did not adopt the school's recommendation for punishment. In light of these facts, the Court can only conclude that the hearing authority did not independently consider Plaintiff's case and reach its own conclusions about punishment, thus depriving Plaintiff of due process once again.

Despite the finding of multiple due process violations, it should be noted all such issues could have easily been remedied had the school board simply provided Plaintiff with a full and fair closed hearing. While Defendant correctly notes that the school board was not obligated by law to provide such a hearing because it was not increasing the punishment handed down by the disciplinary board, given the circumstances it would have been the prudent thing to do and likely would have allowed Defendant to avoid the lawsuit at issue altogether. Defendant contends that the hearing requested by Plaintiff was unnecessary because the process utilized by the school board allowed Plaintiff's voice to be heard. Defendant notes that Plaintiff was permitted to present a packet of information for the school board's consideration containing any information that Plaintiff deemed pertinent to the disciplinary issue; however, this position overlooks the fact that Plaintiff had never been provided with any specifics regarding the conduct in which he was alleged to have engaged nor information about the evidence the School System had demonstrating his culpability.

While the school board was provided with a packet of information which included the statements of those who had been hazed, at least one of which indicated that Plaintiff had played an active role in the hazing incident, once again the record reflects that the school board did not meet its obligation to independently review the disciplinary board's ruling. See Ex. 15. School board member David Hammond testified at trial that there was nothing that Plaintiff could have

50

presented that would have caused him to disapprove of Principal Wright's recommended punishment despite her being in her first year on the job.  He further testified that he believed Plaintiff had engaged in sexual assault and didn't know much of anything about Title IX.  While the Court appreciated Mr. Hammond's candor, his testimony also made it clear that he did not independently review and consider the actions of the disciplinary board.

School board member Annette Buchanan was asked about her understanding of Title IX.  She could not articulate an appropriate understanding of the law nor did she remember that Plaintiff had been accused of violating it.  She also testified that she did not seek clarification of what constituted sexual assault despite Plaintiff being alleged to have committed sexual assault.

While Ronald Dykes was not a voting member of the school board in his role as the Washington County Director of Schools, he was involved in addressing disciplinary matters such as this with the school board members  During Mr. Dykes testimony he incorrectly asserted that Plaintiff violated Title IX by engaging in the hazing at issue and that any sexual assault automatically involves gender discrimination.

Plaintiff's appeal was heard by the school board on February 4, 2016 at its regularly scheduled meeting.  The minutes indicate that Chairman Todd Ganger noted that the appeal was on the agenda and that the school board's counsel was present to answer questions.  No board member asked questions nor was there any discussion or deliberation regarding the appeal.  Ex. 17, p. 2.  Instead, Mr. Hammond made a motion to uphold the decision of the disciplinary committee which was seconded and unanimously approved.  *Id.*  When the testimony of the school board members who appeared at trial is coupled with this lack of deliberation or

discussion, it becomes clear that once again Plaintiff was deprived of due process because the school board did not independently review the disciplinary board's decision.

## Damages

Plaintiff argues he is entitled to damages arising from Defendant's violation of his due process rights. Plaintiff initially requested damages in the amount of $150,000.00 for the loss of relationships with fellow students and teachers, $150,000.00 for the loss of relationships with fellow athletes, $150,000.00 for the harm to his reputation, and $500,000.00 in punitive damages due to the "reckless conduct of the members, agents, and employees" of Defendant [Doc. 1-15, p. 15]. Ultimately, Plaintiff conceded that punitive damages could not be awarded in this case as punitive damages are not recoverable from a government entity under § 1983. *See City of Newport v. Fact Concerts Inc.*, 453 U.S. 247, 259-60 (1981). Plaintiff does maintain that he is entitled to money damages for the harm to his reputation and quality of education as a result of Defendant's violation of his due process rights. *Id.* Additionally, Plaintiff requests attorney fees, court costs, and litigation expenses. *Id.* at 17.

"[T]he basic purpose of § 1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.'" *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (quoting *Carey v. Piphus*, 435 U.S. 247, 254 (1978)) (emphasis in original). To recover such damages, proximate causation must be proved. *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 659 (6th Cir. 1994). Compensatory damages may include injuries such as "impairment of reputation…, personal humiliation, and mental anguish and suffering" as well as monetary harm. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974). Additionally, because the right to due process is so important, the denial of due process is actionable "for nominal damages [not to exceed one dollar] without proof of actual injury." *Carey*, 435 U.S. at 266-67.

While Plaintiff did prove that he suffered significant harm to his reputation, humiliation and mental anguish and suffering, what he did not demonstrate was how those injuries arose as a result of Defendant denying him due process in the disciplinary process. In reviewing Defendant's disciplinary policies, the Court finds that Defendant had the right to suspend Plaintiff for one year for his part in the hazing incident at issue despite him playing a lesser role, but in order to do so had to first provide him with due process; yet, there is the outside possibility that had Plaintiff been provided with the opportunity to give his side of the story after being fully apprised of the charges and evidence against him, Defendant might have lessened his punishment. Even if Defendant's punishment had been lessened, Plaintiff would have remained suspended from football and was properly labeled as a participant in the hazing. The Court also notes that Plaintiff called no expert witness to discuss damages and there was no mention of how Plaintiff arrived at the monetary damages figure he sought. At the same time, there can be no doubt that Plaintiff being deprived of due process in the disciplinary process increased the emotional turmoil he experienced. For this reason, the Court finds it appropriate to award $1.00 in nominal damages.

## Attorney Fees and Litigation Costs

"In any action or proceeding to enforce a provision of section…1983…, the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee…" 42 U.S.C. § 1988(b). "[T]o qualify as a prevailing party, a civil rights plaintiff must obtain…an enforceable judgment against the defendant from whom fees are sought." *Farrar v. Hobby*, 506 U.S. 103, 111 (1992). The Plaintiff must directly benefit from whatever relief he is awarded at the time it is ordered. *Id.* "In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that

directly benefits the plaintiff." *Id.* at 111-12. A plaintiff who wins nominal damages is a prevailing party under § 1988, but generally nominal damages alone will not support an award of attorney fees. *Id.* at 112. Once a plaintiff has been awarded relief which materially alters the legal relationship between the parties, the court then has a basis for awarding fees but whether to actually award them and to what extent must be carefully assessed. *Id.* at 114. "[T]he most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Id.* (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983)). The Supreme Court has cautioned that courts must consider the extent of success when determining the amount of the fee award as fee awards under § 1988 were never intended to produce windfalls to attorneys. *Id.* at 115-16. At the same time, in evaluating a plaintiff's success, the court should also consider whether the litigation accomplishes an important public goal. *See Glowacki v. Howell Pub. Sch. Dist.,* 566 F. App'x. 451, 454 (2014) (citing *Farrar*, 506 U.S. at 111).

Here, Plaintiff has obtained a direct benefit from this litigation by having his permanent record cleared of both the ten-day and the one-year suspensions from school imposed upon him by Defendant. A student's permanent record from high school is a document that follows that student for life; therefore, Defendant has been awarded meaningful direct relief by the Court.

Plaintiff's lawsuit has also brought to light significant shortcomings in how Defendant carries out its disciplinary process and it is crucial that those shortcomings be corrected for the benefit of all students enrolled in the Washington County School System, now and in the future. Given that Defendant had already taken steps toward affording its students due process, there is every reason to believe Defendant will now address the shortcomings which have come to light in the instant action and provide full due process when imposing discipline in the future.

## V.    CONCLUSION

The Court finds that defendant Washington County Department of Education deprived Plaintiff of his right to due process by the manner in which the disciplinary proceedings as to Plaintiff's suspension from school were conducted. Defendant never advised Plaintiff of the specific acts he was alleged to have committed. Those involved in the disciplinary process simply "rubber-stamped" Principal Wright's recommendation as to Defendant's punishment. However, the procedure by which Defendant suspended Plaintiff from the football team for one year did not violate Plaintiff's due process rights because he was not entitled to due process in relation to that suspension.  The Court also notes that because Plaintiff ultimately admitted to playing an active role in the hazing incident, although to a lesser degree than the others involved, Defendant's policies provided Defendant with the authority to discipline Plaintiff by imposing a one-year suspension had Defendant simply provided Plaintiff with proper due process. The fact that Plaintiff was likely subjected to the same hazing the year before and perhaps even at the same camp where he hazed others, while concerning and perhaps worthy of some consideration as a mitigating factor, did not deprive Defendant of the right to impose the recommended punishment upon Plaintiff for his participation in the hazing of other students.

As a result of Defendant's due process violations, Plaintiff asserted that he was entitled to have his permanent record modified to remove the discipline imposed and was further entitled to monetary damages; however, at trial Plaintiff's proof of damages was very limited.  While it was clear that Plaintiff was emotionally impacted to a significant degree by the discipline he received, given that Defendant would have been entitled to impose the same level of discipline had Plaintiff simply been provided with due process, it is difficult to see how Plaintiff would have been emotionally impacted to a significantly lesser degree if he had received the same

discipline after receiving due process. Plaintiff was ultimately able to return to regular classes and to his new high school's football team prior to the end of the 2015-2016 school year and to graduate on time. Plaintiff provided no testimony to indicate that the discipline imposed has negatively impacted his ability to attend college or serve in the military.

Still, the fact that Plaintiff was deprived of due process left him to wonder if things might have been different if his side of the story had been fully heard. The Court finds it appropriate to award nominal damages of $1.00 because, while Plaintiff has failed to prove with sufficient specificity how he was impacted by Defendant's failure to provide him with due process, it is clear that he was in fact impacted by this deprivation.

Because Plaintiff's ten-day and one-year suspensions were imposed without the benefit of due process, the Court also finds that Plaintiff is entitled to have any reference to this discipline removed from his permanent record, except that any reference as to his suspension from the football team which currently exists may remain. Any reference to Plaintiff's suspension from the football team must not indicate that Plaintiff committed sexual assault or violated Title IX, as Defendant's actions do not meet the definition of sexual assault under Tennessee law and, as Defendant concedes, Plaintiff as an individual could not have violated Title IX.

Given Plaintiff's success in having the suspensions at issue removed from his permanent record and the importance of the due process issues addressed by Plaintiff in this litigation, the Court also finds that it is appropriate to award Plaintiff his costs and a portion of his attorney fees, the extent of which the Court will determine after Plaintiff's counsel has filed a motion with supporting affidavit setting forth the costs and attorney fees sought and Defendant has responded thereto. Plaintiff's counsel shall file the motion and affidavit within thirty days from

56

entry of the judgment in this matter, and Defendant shall respond thereto within thirty days after the motion is filed. The Court will allow the parties to present oral argument as to the issue of attorney fees and costs if either party makes a written request, but otherwise the Court will rule after receiving the parties' submissions.

SO ORDERED:

/s Cynthia Richardson Wyrick
United States Magistrate Judge